# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| |
|---|
| Wendy Koutouzis, on behalf of herself and all other similarly situated individuals, |
| |
| Plaintiff, |
| |
| vs. |
| |
| Publix Super Markets, Inc., |
| |
| Defendant. |

Case No.: 25-cv-20767-RAR

## OPPOSITION TO DEFENDANT PUBLIX SUPER MARKETS, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT

Anthony J. Russo Jr.
THE RUSSO FIRM
1001 Yamato Road, Suite 106
Boca Raton, FL 33431
T: 844-847-8300
E: anthony@therussofirm.com

James C. Kelly, Esq. (*pro hac vice*)
THE RUSSO FIRM
244 5th Avenue, Suite K-278
New York, NY 10001
T: 212-920-5042
E: jkelly@therussofirm.com

*Counsel for plaintiff*

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION..................................................................................................................1

II.     FACTUAL BACKGROUND..............................................................................................2

    A. The Deceptive Weight Inflation Scheme..............................................................2

    B. Expired and False Sale Signs..................................................................................3

    C. The Most Insidious Deception: Non-Self-Checkout Transactions............................3

    D. The Hollow "Publix Promise" and Post-Lawsuit Concealment................................4

III.    LEGAL STANDARD..........................................................................................................6

IV.     ARGUMENT........................................................................................................................6

    A.  The FAC Is a Model of Clarity, Not a Shotgun Pleading..........................................6

    B.  Plaintiff Has Clear Article III Standing to Pursue Her Claims..................................7

    C.  The Voluntary Payment Doctrine Is Wholly Inapplicable to a Scheme of
       Active Deception and Coercion................................................................................10

    D.  Plaintiff Has Adequately Pled All Elements of Her FDUTPA Claim.....................11

    E.  The Unjust Enrichment Claim Is a Viable and Necessary Equitable Remedy.........12

    F.  Plaintiff States a Clear Claim for Breach of the Unilateral Contract Created
       by the Publix Promise..............................................................................................12

    G.  Plaintiff Has Standing for Injunctive Relief Because Publix's Systemic and
       Unpredictable Deception Poses a Real and Immediate Threat of Future Harm.......14

    H.  Publix's Cited Authorities Are Inapposite and Readily Distinguishable................15

    I.   Plaintiff's Continued Patronage Does Not Negate Her Injury but Rather
       Highlights the Pervasive Nature of The Deception and Lack of Alternatives.........18

V.      CONCLUSION..................................................................................................................20

## I. INTRODUCTION

Plaintiff Wendy Koutouzis, on behalf of herself and a nationwide class of similarly situated consumers, respectfully submits this memorandum of law in opposition to Defendant Publix Super Markets, Inc.'s ("Publix") Motion to Dismiss the First Amended Class Action Complaint ("FAC") (ECF No. 29). Publix's motion is a transparent effort to evade responsibility for a multifaceted, systemic, and calculated scheme of deceptive pricing that has systematically extracted millions of dollars from unsuspecting customers. The motion fundamentally misconstrues the detailed allegations of the FAC, distorts well-settled pleading standards, and asks this Court to endorse a view of consumer transactions that is divorced from reality—one where consumers possess perfect information, face no time or cognitive pressures, and are required to perform forensic accounting at the checkout counter to avoid being cheated.

The FAC is not, as Publix contends, a "shotgun pleading." It is a precise and damning indictment of corporate misconduct, meticulously detailing at least four distinct but interrelated deceptive practices: (1) a sophisticated point-of-sale ("POS") system programmed to secretly inflate the weights of products sold by the pound, thereby negating advertised discounts (FAC ¶¶ 41-83); (2) the deliberate use of expired sale and false clearance signs to lure customers into paying higher, non-sale prices (FAC ¶¶ 84-93); (3) the misrepresentation of unit pricing on essential items like baby formula (FAC ¶¶ 94-96); and (4) the routine failure to honor its own widely advertised "Publix Promise," which it holds out as a backstop against the false pricing but which, in practice, is a hollow guarantee used to placate and deter aggrieved customers (FAC ¶¶ 126-136, 225-234). These are not isolated mistakes; they are interlocking components of a corporate strategy designed to inflate revenue at the direct expense of its customers.

1

Publix's arguments for dismissal—ranging from manufactured standing challenges to a cynical invocation of the voluntary payment doctrine—wither under the slightest scrutiny. Plaintiff has alleged concrete, unrefunded economic injuries directly traceable to Publix's deceptive acts.

This Court should reject Publix's arguments wholesale, as they fail to undermine Plaintiff's Article III standing, the viability of her FDUTPA, unjust enrichment, and breach of contract claims, or her entitlement to declaratory relief. The FAC's allegations, taken as true at this stage, paint a damning picture of a corporate giant exploiting its market dominance to deceive consumers, necessitating judicial intervention to halt these practices and redress the harm inflicted.

## II. FACTUAL BACKGROUND

### A. The Deceptive Weight Inflation Scheme

The cornerstone of Publix's deception is its programming of its POS system to secretly inflate the weight of sold-by-weight products when they are on sale. This practice creates the illusion of a discount while charging the customer a price at or near the original, non-sale price. The FAC provides numerous, specific examples, complete with photographic evidence. For instance, Plaintiff purchased a Publix Extra Lean Pork Tenderloin labeled as weighing 2.83 pounds and advertised at a sale price of $4.99 per pound. The correct sale price should have been $14.12. However, Publix's POS system covertly changed the weight to 3.96 pounds, resulting in a charge of $19.78—a 40% overcharge that completely negated the advertised "$2.00 off per pound" savings (FAC ¶¶ 4-14). This was not an isolated incident. The FAC documents a pattern of identical weight inflation and overcharges on products including Kentucky Legend Turkey Breast (25% overcharge), Kentucky Legend Smoked Ham (35% overcharge), Springer Mountain Whole Chicken (20% overcharge), Hormel Ham (33% overcharge), and Publix Deli Cranberry Cheddar Cheese (11% overcharge) (FAC ¶¶ 48-83). The receipts deceptively display a "You Saved" amount, further masking the fact that no true savings were

realized. The FAC alleges this is accomplished because "Publix's POS is programmed so that the total price of the product matches the total price on the customer's receipt or the POS screen, so to avoid detection" (FAC ¶ 8). This digital trickery is compounded by the fact that "the customer's receipt does not list the weight of the product but only the alleged savings and the total price of the product" (FAC ¶ 9), making post-purchase discovery of the fraud nearly impossible.

**B. Expired and False Sale Signs**

Publix supplements its digital deception with physical misrepresentations in its aisles. The FAC alleges that Publix systematically leaves expired sale signs on display to induce purchases at higher prices. Plaintiff was overcharged for Granny Smith Apples, which rang up at $2.69 per pound despite a prominent sign advertising them for $1.99 per pound (FAC ¶¶ 84-88). Similarly, Publix uses false clearance signs, such as for a Stem bug spray marked at a clearance price of $4.79 that repeatedly scanned at the full price of $9.59, even after Plaintiff notified the stores of the error (FAC ¶¶ 89-93).

Plaintiff's experiences, and her subsequent decision to meticulously document her shopping trips, occurred against a backdrop of what the FAC alleges is a widely recognized problem of retailer deception. The Complaint notes that "Publix is not alone in overcharging customers" and that its conduct "mirrors allegations in lawsuits against Walmart... and reports of store-wide pricing errors at Kroger" (FAC ¶ 140). This is not mere speculation; the FAC alleges that major news outlets have put consumers on high alert, citing a Good Morning America report that explicitly "warned customers to take photographs of sales tags while grocery shopping now" due to the prevalence of such deceptive pricing across the industry (FAC ¶ 140).

**C. The Most Insidious Deception: Non-Self-Checkout Transactions**

Crucially, the FAC alleges that these overcharges also occurred during transactions at traditional, non-self-checkout lanes, where the customer has no opportunity whatsoever to see the

weight manipulation on a POS screen. In these instances, the consumer is entirely at the mercy of Publix's system and its employees. The FAC details several such undocumented overcharges that Plaintiff experienced before she began meticulously photographing every transaction. These include being overcharged for Boars Head Parmigiano Reggiano cheese, a $60 beef tenderloin, and a whole chicken (FAC ¶¶ 141-144). In each case, when Plaintiff questioned the price, she was met with resistance and false assurances from cashiers and managers, who insisted the sale price had been applied. These interactions highlight the severe information asymmetry and power imbalance inherent in the transactions, rendering any subsequent payment involuntary. For example, when Plaintiff questioned the price of an expensive beef tenderloin, a manager dismissed her concerns, stating "the meat was too expensive to provide the Publix Promise" (FAC ¶ 143). In another instance, when Plaintiff sought a refund for overcharged cheese, "the cashier insisted she obtained the sale price, and Plaintiff accepted it and did not obtain a refund" (FAC ¶ 142).

**D. The Hollow "Publix Promise" and Post-Lawsuit Concealment**

Central to this case is Publix's widely advertised "Publix Promise," a guarantee that if an item scans at a price higher than advertised, the customer receives that item for free (FAC ¶ 126). The FAC alleges this is a unilateral contract that Publix systematically breaches. Instead of honoring the Promise, employees deny discrepancies, impose arbitrary and undisclosed price limits (e.g., a manager dismissing a claim for an overpriced beef tenderloin because it was "too expensive" to qualify), and make the refund process so arduous that it deters customers from pursuing their claims (FAC ¶¶ 98-101, 129-135, 143-144). The experiences of other consumers, like Deborah Ross in Florida who had to return to the store three times to correct an overcharge on a turkey whose weight was inflated by two pounds (FAC ¶¶ 131-135), confirm this is a pattern. The FAC alleges this process is intentionally arduous and humiliating, designed to deter consumers from seeking the remedy they

4

are owed. Plaintiff alleges that employees would "try to embarrass or belittle her, stating 'she wants it for free' or 'you did get the discount, see, you saved' pointing to the falsely stated 'You Saved' on the receipt" (FAC ¶ 165). This alleged treatment transforms the "Promise" from a customer service guarantee into a tool of intimidation.

This failure to honor the Publix Promise is not limited to the experiences of Plaintiff and other consumers who contacted her counsel. The FAC alleges that these issues are so common they have been reported in the media, citing a writer for The Palm Beach Post who detailed an identical experience. After being overcharged for a Snapple, the writer noted that the customer service employee acted as if providing the advertised price was merely "a favor". A subsequent complaint to corporate headquarters about the incident went unanswered for six months, confirming the institutional nature of this indifference (FAC ¶ 164). Plaintiff alleges the process is intentionally difficult, requiring the consumer to "repeatedly plead their case to obtain a refund" and that "there was a good chance her request would be denied anyway, especially if the product was a high-priced item" (FAC ¶¶ 98, 101).

Finally, in a clear act of consciousness of guilt, Publix modified its POS system after this lawsuit was filed to no longer display the inflated weight or the bogus price per unit of sold-by-weight products at checkout (FAC ¶¶ 167-171). This change does not fix the underlying weight inflation; it merely conceals it more effectively, making it nearly impossible for consumers to detect the fraud in real-time and underscoring the need for judicial intervention. This modification, the FAC alleges, "prevents consumers from detecting such discrepancies in real-time, exacerbating the deception inherent in Publix's pricing scheme" (FAC ¶ 171).

## III. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) does not test the merits of a case, but only the sufficiency of the complaint's factual allegations. The Court's role is to determine whether the complaint "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the plaintiff pleads factual content that allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). All well-pled factual allegations must be accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. *Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010). Dismissal is a drastic remedy reserved for cases where the plaintiff can prove no set of facts that would entitle her to relief.

## IV. ARGUMENT

### A. The FAC Is a Model of Clarity, Not a Shotgun Pleading

Publix's contention that the FAC constitutes a shotgun pleading is a boilerplate objection devoid of merit. The Eleventh Circuit condemns pleadings that fail to give fair notice of the claims by either lumping multiple causes of action into a single count or being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321-23 (11th Cir. 2015). The FAC does neither. It methodically lays out four distinct counts—(I) FDUTPA, (II) Declaratory Judgment, (III) Unjust Enrichment, and (IV) Breach of Contract—each predicated on a clear and distinct legal theory and supported by specific factual allegations (FAC ¶¶ 188-234). The practice of incorporating all allegations is not only permissible but often necessary in complex consumer class actions where the

defendant's various wrongful acts are part of an overarching scheme. Publix's real complaint is not with the FAC's structure, but with the damning substance of its allegations.

Publix's complaint about the interrelated nature of the facts demonstrates a misunderstanding of its own alleged scheme. The facts are incorporated because the claims are inextricably linked. For example, the deceptive weight inflation (part of the basis of the FDUTPA claim in Count I) is the very event that triggers the application of the Publix Promise. Publix's subsequent refusal to honor that Promise then gives rise to the breach of contract claim (Count IV). Likewise, the money Publix wrongfully obtains through the weight inflation scheme is the same money it is inequitable for Publix to keep under the unjust enrichment claim (Count III). Pleading these facts once and incorporating them is not a "shotgun" tactic; it is a model of efficiency that avoids the needless repetition of a 173-paragraph fact section for each of the four counts. The FAC provides more than adequate notice; it provides a detailed roadmap of Publix's wrongdoing.

**B. Plaintiff Has Clear Article III Standing to Pursue Her Claims**

Publix's multi-pronged attack on Plaintiff's standing is fundamentally flawed. Plaintiff has alleged a concrete injury-in-fact that is directly traceable to Publix's conduct and is redressable by this Court.

First, Plaintiff suffered a quintessential injury-in-fact: economic loss. She paid more for products than their advertised sale price, resulting in documented overcharges (FAC ¶¶ 14, 56, 61, 63, 70, 96). Publix's argument that refunds for some purchases negate her injury is legally incorrect. The FAC explicitly alleges numerous purchases for which Plaintiff was not refunded, including pork loins, turkey, ham, chicken, and baby formula (FAC ¶ 97), as well as the cheese, beef, and chicken from the non-self-checkout lanes (FAC ¶¶ 142-144). These uncompensated losses are textbook economic injuries sufficient for standing. *See Kukorinis v. Walmart, Inc.*, 2020 WL 13388297 (S.D.

Fla. June 1, 2020) (finding that "…Plaintiff has alleged a particularized and concrete harm….The concrete and particular harm alleged is that he was overcharged for Weighted Goods"). Furthermore, even for refunded items, the time, effort, and frustration involved in detecting an error and fighting resistant employees for a refund constitutes a separate, cognizable injury.

Second, these injuries are directly traceable to Publix's conduct. Publix designed, implemented, and controls the deceptive POS system, the misleading in-store signage, and the policies governing the sham "Publix Promise." To argue, as Publix does, that Plaintiff's injury is "self-inflicted" because she completed the transactions is absurd. This blames the victim for the crime. Plaintiff's payment is the culmination of Publix's fraudulent inducement, not an intervening cause. *See Kahn v. Walmart Inc.*, 107 F.4th 585 (7th Cir. 2024) (rejecting traceability challenge where the retailer's deception created the very situation forcing the consumer to act).

Third, Plaintiff's injuries are eminently redressable through damages, declaratory relief clarifying Publix's obligations, and an injunction to halt its ongoing, deceptive practices. The threat of future harm is not speculative; it is guaranteed, as evidenced by Publix's post-lawsuit modification of its POS system to better conceal the fraud (FAC ¶¶ 167-173). This ensures that Plaintiff and all other class members will continue to be harmed absent judicial intervention.

Publix's argument that the unrefunded overcharges for cheese, beef, and chicken are insufficiently pled (MTD at 11-12) is a transparent attempt to impose an evidentiary standard at the pleading stage. The FAC provides more than sufficient detail to state a plausible claim for relief. For each of these transactions, Plaintiff alleges the specific product purchased, the approximate terms of the advertised sale, the fact that she disputed the overcharge with Publix employees, their specific response (denial and resistance), and the ultimate outcome that no refund was provided (FAC ¶¶ 142-

144). These are not conclusory allegations; they are specific factual assertions that give Publix more than fair notice of the claims against it.

The very reason these allegations lack photographic evidence is central to the claim: these were the initial instances where the deception was so effective that Plaintiff could not immediately discern the mechanism of the overcharge, especially in a non-self-checkout lane where she was blind to the POS screen (FAC ¶ 10). When viewed in the context of the entire FAC, the only reasonable inference is that these overcharges resulted from the exact same deceptive weight-inflation scheme detailed elsewhere. It would be illogical to assume that Publix employs one scheme to overcharge customers at self-checkout and a completely different, unknown scheme to accomplish the same result at traditional checkout lanes.

Finally, Publix's argument that damages are not plausibly pled for these transactions is demonstrably false. For the beef tenderloin, the FAC alleges the item cost approximately $60 at a regular price of approximately $24.99 per pound, which allows for the reasonable inference that the product weighed about 2.4 pounds. The failure to receive the advertised "$5 dollars less than its regular sales price" discount thus resulted in a plausible, non-speculative overcharge of approximately $12.00 (FAC ¶ 143). More damningly, for the chicken purchase, the FAC explicitly alleges that "the receipt claimed that she 'saved' approximately $5," but that Plaintiff was, in fact, overcharged by that very amount (FAC ¶ 144). This is a specific, non-speculative allegation of a quantifiable economic loss. At the pleading stage, the amount Publix itself printed on its receipt as the illusory "savings" serves as a perfectly plausible measure of Plaintiff's minimum damages for that transaction. The exact calculation of damages is a matter for discovery, but the FAC has more than met its burden to plead a concrete, un-remedied injury-in-fact that gives her standing to sue.

**C. The Voluntary Payment Doctrine Is Wholly Inapplicable to a Scheme of Active Deception and Coercion**

Publix's primary defense—that the voluntary payment doctrine bars Plaintiff's claims—is its most audacious and its most flawed. The doctrine is an equitable defense meant to bar recovery of payments made with knowledge of all the material facts and in the absence of fraud, deception, or duress. *City of Miami v. Keton*, 115 So. 2d 547, 551 (Fla. 1959). It is a shield against buyer's remorse, not a license for sellers to defraud. Here, it fails for at least three independent reasons. Publix cannot hide behind this doctrine when its entire scheme is predicated on deception. As the FAC alleges, Plaintiff faced a checkout screen where "the weight of the item alongside a sale price per pound, with a total matching the pre-sale label, creat[ed] confusion" (FAC ¶ 153).

First, Plaintiff and the class never possessed "full knowledge." Publix's argument rests on the fiction that a consumer who spots a price discrepancy on a checkout screen instantly comprehends the full scope and mechanism of a sophisticated, concealed weight-inflation scheme. This is nonsense. As the FAC alleges, the checkout experience is characterized by cognitive overload, time pressure, and social pressure (FAC ¶¶ 152-154). A consumer might suspect an error, but they do not have "full knowledge" that the weight itself has been systematically and deliberately altered by the software. As the Seventh Circuit recognized in a nearly identical case, requiring consumers to conduct an investigation at checkout to protect themselves from deception is unreasonable. *Kahn*, 107 F.4th at 599. The doctrine requires knowledge of the facts, not mere suspicion of a problem.

Second, the doctrine is nullified by the FAC's extensive allegations of fraud and deception. The very purpose of the weight-inflation scheme—matching the final price to the original label price—is to conceal the deception and prevent the consumer from noticing. The doctrine cannot be invoked by a party with unclean hands to immunize its own fraudulent conduct.

Third, and most powerfully, the doctrine is obliterated by the allegations regarding non-self-checkout transactions (FAC ¶¶ 141-144). In these encounters, the "knowledge" element is not just diminished; it is entirely absent. The consumer has no POS screen. They see only a product with a sale sign, hand it to a cashier, and receive a receipt that deceptively omits the inflated weight while falsely claiming a "savings." When Plaintiff questioned the charges, she was actively misled by Publix employees who insisted the price was correct. A payment made under these circumstances—total information asymmetry and active misrepresentation by the seller's agent—is the legal and logical opposite of a "voluntary" payment made with full knowledge. It is a payment made under duress and induced by deception. In these situations, consumers are completely blind to the fraud, as the FAC alleges that "If the customer is not able to see the checkout screen, which is the case with non-self-checkout lanes, the customer will never know that the weight was changed" (FAC ¶ 10). These allegations alone are sufficient to render the voluntary payment doctrine inapplicable at the pleading stage. Publix's market dominance, which creates economic duress by limiting viable shopping alternatives for consumers like Plaintiff, further underscores the involuntary nature of these payments (FAC ¶¶ 156-159).

**D. Plaintiff Has Adequately Pled All Elements of Her FDUTPA Claim**

The FAC states a textbook claim under FDUTPA, which broadly prohibits "unfair or deceptive acts or practices." Fla. Stat. § 501.204(1). A practice is deceptive if it is "likely to mislead a reasonable consumer." *Zlotnick v. Premier Sales Grp., Inc*., 480 F.3d 1281, 1284 (11th Cir. 2007). Publix's coordinated scheme of weight inflation, false signage, and misleading receipts is more than likely to mislead; it is designed to do so. A reasonable consumer rightfully expects an advertised sale price to be honored, not secretly negated by digital sleight-of-hand. *Kukorinis*, 2020 WL 13388297. Plaintiff suffered actual damages in the form of overpayments—the difference between the price she

11

paid and the price that she should have paid—on numerous unrefunded purchases (FAC ¶ 97, 204-205). Causation is direct: Publix's deceptive acts induced Plaintiff to purchase products she would not have otherwise purchased, or to pay a higher price than she was led to believe she would pay.

**E. The Unjust Enrichment Claim Is a Viable and Necessary Equitable Remedy**

Plaintiff's unjust enrichment claim, properly pled as an alternative theory, is essential to ensure a remedy for the full scope of Publix's fraudulent scheme. To state a claim for unjust enrichment, a plaintiff must allege that: (1) she conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained the benefit; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying for it. *Zamber v. Am. Airlines, Inc,* 282 F. Supp. 3d 1289, 1301 (S.D. Fla. 2017).

The FAC squarely meets this standard. Plaintiff and the class conferred a direct monetary benefit on Publix every time they were overcharged due to weight inflation, expired sale signs, or false clearance prices (FAC ¶¶ 215-216). Publix, through its deliberately programmed POS system and its knowledge of its own in-store signage, knowingly retained these ill-gotten gains (FAC ¶¶ 41, 218-219). The inequity is manifest. Publix's argument that consumers received the "benefit of their bargain" is preposterous. The bargain was not merely for a physical product; it was for that product at the advertised sale price. When a consumer pays more than the advertised price due to a hidden deception, they have been deprived of the central benefit of their bargain—the promised value.

**F. Plaintiff States a Clear Claim for Breach of the Unilateral Contract Created by the Publix Promise**

Separate and distinct from the unjust enrichment claim is Plaintiff's straightforward claim for breach of contract. The "Publix Promise"—which guarantees that "if during checkout, the scanned price of an item...exceeds the shelf price or advertised price, we will give the customer one of that

item free" (FAC ¶ 227)—is a classic unilateral offer made to the public to induce reliance and build consumer trust.

Plaintiff and class members accepted this offer by full performance: they shopped at Publix in reliance on this and other promises, identified an item that scanned at a higher price, and brought the discrepancy to Publix's attention (FAC ¶ 229). The consideration is twofold: the benefit to Publix of having its customers perform free quality control on its pricing systems, and the detriment to the customer of having to spend time and effort policing the transaction and arguing with employees.

Publix's argument that the Promise lacks consideration fails as a matter of law. Consideration for a unilateral contract like the Publix Promise does not require a bargained-for exchange in the traditional sense. Rather, it is supplied by the value a company receives when a consumer acts in reliance on the promise. *See* Restatement (Second) of Contracts § 90. Here, the consideration flowing to Publix is immense. The Promise induces customers to choose Publix over its competitors, creating store loyalty and driving sales. It creates a powerful perception of trustworthiness and fairness, which is an invaluable business asset. It also outsources the work of price verification to its customers, who provide free labor in identifying and reporting the very errors Publix's systems create. Plaintiff and the class provided this consideration when they relied on the Promise, patronized Publix's stores, and performed the act of identifying a pricing error. Publix cannot solicit this reliance and then claim its promise was an unenforceable, illusory gesture.

Publix systematically breached this contract. The FAC alleges numerous instances where Publix flatly refused to honor the Promise, either by outright denying the pricing error, fabricating undisclosed exceptions like the item being "too expensive" (FAC ¶ 143), or making the process so confrontational that the customer gives up (FAC ¶ 165). Furthermore, even in instances where a customer successfully obtained a refund for the overcharge amount, Publix still breached its Promise

13

by failing to provide the free item as contractually required. A partial remedy is not a substitute for full performance of a contractual obligation. The damages flowing from this breach are clear and calculable: the full retail value of the free item Plaintiff and class members were denied, in addition to any unrefunded overcharge. This claim is not duplicative; it seeks a distinct contractual remedy for Publix's failure to keep its express "Promise."[1]

## G. Plaintiff Has Standing for Injunctive Relief Because Publix's Systemic and Unpredictable Deception Poses a Real and Immediate Threat of Future Harm

Publix argues that Plaintiff lacks standing for injunctive relief because, now aware of the deceptive schemes, she cannot be harmed in the future. In doing so, it relies on cases like *Piescik v. CVS Pharmacy, Inc*., 576 F. Supp. 3d 1125 (S.D. Fla. 2021), where a plaintiff's knowledge of a single product's misleading label could allow them to avoid future harm by simply not buying that product. This argument fundamentally misapprehends the nature of the injury alleged here and is directly contradicted by case law addressing identical facts.

A consumer cannot steer clear of the deception when the deception could apply to any number of products at any time. Plaintiff cannot simply avoid buying "the" deceptive product because the deception is not tied to one product; it is a systemic flaw in Publix's POS system that can affect any of the thousands of sold-by-weight products Publix sells (FAC ¶¶ 41-47). To avoid future harm, Plaintiff would have to cease purchasing entire categories of staple goods like meat, cheese, and

---

[1] Publix's challenge to the breach of contract claim, citing cases like *Vanguard Plastic Surgery, PLLC v. Cigna Health & Life Ins. Co*., 2023 WL 2168513 (S.D. Fla. Jan. 18, 2023), for a failure to plead consideration, misunderstands the nature of a unilateral contract. The Publix Promise is not a traditional, negotiated bilateral agreement; it is a public offer made to induce consumer reliance. Consideration is supplied when the consumer performs the requested act: patronizing Publix, identifying a pricing error, and bringing it to the company's attention. This provides Publix with the immense value of store loyalty and free quality control. To suggest this exchange lacks consideration is to ignore the commercial realities of modern retail advertising.

14

produce, or perform a forensic audit of every single transaction. This is an unreasonable and untenable burden.

Furthermore, the threat of future harm is not merely speculative; it is guaranteed and evolving. The FAC alleges that after this lawsuit was filed, Publix modified its POS system to make the deception harder to detect by removing weight and unit price information from the checkout screen (FAC ¶¶ 167-171). This post-lawsuit conduct is the ultimate proof of an ongoing and immediate threat of future harm, demonstrating that Publix has no intention of ceasing its misconduct and is actively working to conceal it more effectively. This makes the need for an injunction to halt these practices not only appropriate but essential.

Recent and on-point authority comes from the Middle District of Florida in *Kukorinis v. Walmart, Inc.*, 2023 WL 4364454 (M.D. Fla. July 6, 2023). There, the court expressly held that a plaintiff who alleges they "will continue to shop" at the defendant's stores has "necessarily stated a claim for declaratory or injunctive relief as well." *Id*. at 7. The court recognized that under FDUTPA, the term "aggrieved" is more expansive than "damaged," and that "regardless of whether an aggrieved party can recover 'actual damages'... it may obtain injunctive relief". *Id*. (internal citations omitted). Plaintiff here has made the same allegation—that she continues to shop at Publix out of necessity due to its market dominance (FAC ¶ 158-159)—and thus has standing to seek an injunction to stop future harm.

**H. Publix's Cited Authorities Are Inapposite and Readily Distinguishable**

In its attempt to argue Plaintiff's injury was "self-inflicted," Publix relies on a string of cases that are factually and legally inapplicable to the scheme alleged here. These cases involve plaintiffs who either affirmatively created their own harm or were complaining about subjective matters, neither of which is true here.

15

For instance, Publix's reliance on *Pevsner v. E. Air Lines, Inc.*, 493 F. 2d 916 (5th Cir. 1974) is particularly telling. In *Pevsner*, the plaintiff was not overcharged but demanded to be overcharged specifically so he could manufacture standing for a lawsuit. That is the definition of a self-inflicted injury. Here, Plaintiff Koutouzis did not ask to be overcharged; she was the victim of a pre-existing, covert scheme programmed into Publix's POS system. She did not create her injury; she discovered it.

Similarly, Publix's citation to *Valiente v. Publix Super Markets, Inc.*, No. 22-22930-Civ-Scola, 2023 WL 3620538 (S.D. Fla. May 24, 2023) is unavailing because it conflates two entirely different company policies. Valiente dealt with Publix's general satisfaction guarantee, which states: "If for any reason your purchase does not give you complete satisfaction, the full purchase price will be cheerfully refunded." This is a broad, subjective policy designed to remedy a customer's personal dissatisfaction for any reason. The injury here, however, is not subjective dissatisfaction; it is an objective, mathematical overcharge. This specific type of error triggers a different, more specific, and controlling contractual promise: the "Publix Promise," which guarantees a free item if the scanned price exceeds the advertised price (FAC ¶ 227). The availability of a general refund for a subjective reason does not excuse Publix's breach of its specific, objective promise to provide a free item as a remedy for its own pricing errors. Plaintiff's claim is not that she was merely "dissatisfied"; it is that she was overcharged and then denied the explicit contractual remedy Publix promised for that exact situation.[2]

---

[2] Cases like *Schalamar Creek Mobile Homeowner's Ass'n v. Adler*, 855 F. App'x 546 (11th Cir. 2021), are irrelevant as they involve complex real estate or financial transactions where sophisticated parties had full knowledge of the fee structures they later complained about before entering the transaction. They do not apply to a low-dollar, high-volume retail environment where a consumer is subjected to a rapid-fire checkout process deliberately designed to obscure the very overcharges at issue.

Publix attempts to dismantle Plaintiff's claims by citing a handful of consumer protection cases that are factually and legally distinguishable from the pervasive, direct-overcharge scheme alleged here. A closer look reveals that these authorities do not support dismissal and, in fact, highlight the strength of the FAC's allegations.

Publix's primary argument—that Plaintiff received the "benefit of the bargain" and thus suffered no damages—rests on a flawed comparison to cases like *Bechtel v. Winn-Dixie Stores, Inc.*, No. 23-cv-1470, 2024 U.S. Dist. LEXIS 198109 (M.D. Fla. Oct. 31, 2024). In *Bechtel*, the facts are wholly distinct from this case. There, the plaintiffs challenged a Buy-One-Get-One ("BOGO") sale where the price of the first item was allegedly inflated from its pre-BOGO sale price. The court found no damages because, critically, the total cost for two items under the BOGO deal was still significantly less than purchasing two items at their regular, pre-sale price. The consumers in *Bechtel* still received a net financial benefit—a bargain, albeit a smaller one than they expected.

The scheme alleged here is the polar opposite. Plaintiff did not receive a lesser bargain; she was subjected to a bait-and-switch that resulted in a direct financial loss. The FAC alleges Publix represented a sale price (e.g., $4.99/lb for pork tenderloin) but then covertly manipulated the product's weight to charge a higher, non-sale price ($19.78 instead of the promised $14.12). This is not a diminished discount; it is a simple overcharge. The "bargain" was for a product at a specific, represented price, and Publix's deception caused Plaintiff to pay more than that promised price. This direct overpayment is a classic, cognizable injury under FDUTPA. Publix's attempt to equate receiving a smaller-than-expected discount with being secretly overcharged is a cynical misrepresentation of the law and the facts.

Similarly, Publix's reliance on *Green v. PepsiCo, Inc.*, No. 18-62011-Civ-Scola, 2019 WL 8810364 (S.D. Fla. Apr. 12, 2019), is even more misplaced. Green concerned the intrinsic quality and

17

safety of the product itself (alleged presence of glyphosate), a fundamentally different issue from the fraudulent nature of a transaction's pricing. In *Green*, the court found that "The Plaintiff's economic harm is "legally insufficient because Plaintiff already consumed the product, did not suffer distinct and palpable adverse health consequences, and otherwise suffered no injuries from [the product]." The harm here is not a defective product, but a deceptive price.

Publix's reliance on *Hutson v. Rexall Sundown, Inc.*, 837 So. 2d 1090 (Fla. 4th DCA 2003) to attack causation on the FDUTPA claim is also misplaced. In *Hutson*, the plaintiff alleged the front label of a supplement bottle was misleading about the number of pills per serving. However, there was no causation because the back of the bottle contained a clear, unambiguous directions panel that disclosed the correct dosage. The plaintiff there had access to the complete and correct information on the very product he held in his hand. Here, the opposite is true. The "truth" of Publix's scheme— the covert manipulation of the product's weight inside the POS system—is information to which Plaintiff and the class have no access. The deception is the how, which is entirely concealed from the consumer, making *Hutson* irrelevant to this case.

**I. Plaintiff's Continued Patronage Does Not Negate Her Injury but Rather Highlights the Pervasive Nature of The Deception and Lack of Alternatives.**

Finally, Publix suggests that Plaintiff's claims are invalid because she continued to shop at Publix despite being aware of its schemes, citing cases like *Ramirez v. Kraft Heinz Foods Co.*, 684 F. Supp. 3d 1253 (S.D. Fla. 2023). This argument ignores the reality of the consumer experience alleged in the FAC and is directly contradicted by on-point case law.

First, Publix's argument assumes Plaintiff possessed immediate and perfect knowledge of a complex, systemic fraud. The FAC alleges her understanding evolved over time. After the first few overcharges, she reasonably could have presumed that the issues were corrected or that the errors

were isolated incidents. The deception, by its nature, was not present on every item, making it impossible for Plaintiff to know when the fraud would strike next.

Second, this line of reasoning has been explicitly rejected by courts analyzing nearly identical facts. In *Kukorinis v. Walmart, Inc*., the Court held: "Contrary to Walmart's assertion, the fact that Plaintiff continued to purchase Weighted Goods does not negate his injury but may in fact highlight the pervasive effect of the alleged misconduct". *Kukorinis v. Walmart, Inc.*, 2020 WL 13388297 (S.D. Fla. June 1, 2020). The argument also ignores the economic duress alleged in the FAC, which states that Publix's market dominance in Florida, with 872 stores, "leaves consumers with few viable alternatives" and "forces Plaintiff and many consumers to shop at Publix, despite its deceptive practices" (FAC ¶¶ 156, 158-159). Continued patronage in the face of limited choice is not a waiver of one's right to be free from deception; it is evidence of the defendant's market power. The Seventh Circuit's ruling in *Kahn*, 107 F.4th 585 (7th Cir. 2024), further supports that it is unreasonable to expect consumers to cease patronizing a major grocer to avoid being subjected to its deceptive practices. Plaintiff's continued shopping does not defeat her claim; it underscores the necessity of this litigation.

The Middle District of Florida, in another case against involving these same deceptive pricing theories, also squarely addressed and rejected the argument that a plaintiff's awareness defeats causation under FDUTPA. The court emphasized that the standard is objective, not subjective: "Because the standard for evaluating causation is objective, it is immaterial whether Mr. Kukorinis himself was deceived by Walmart's pricing scheme." *Kukorinis v. Walmart, Inc*., 2023 WL 4364454, at *5 (M.D. Fla. July 6, 2023). The court held that allegations that the pricing scheme "influences customers' decisions and induces them to purchase products, only to be charged a higher price at the register" are sufficient to plead causation and damages under FDUTPA. *Id*. Publix's argument is

therefore contrary to established law within both the Southern and Middle Districts of Florida. Indeed, the FAC makes this exact allegation, pleading that the advertised sale prices were "designed to encourage consumers to purchase the Products" and that Plaintiff and the class "purchased the Products after viewing and relying on the sale prices" (FAC ¶¶ 32, 200); *see also* FAC ¶¶ 143, 199.

## V. CONCLUSION

For all the foregoing reasons, Plaintiff Wendy Koutouzis respectfully requests that the Court deny Defendant's Motion to Dismiss in its entirety and permit this action to proceed.

Dated: July 7, 2025

Respectfully submitted,

*/s/ Anthony J. Russo*
Anthony J. Russo Jr.
THE RUSSO FIRM
1001 Yamato Road, Suite 106
Boca Raton, FL 33431
T: 844-847-8300
E: anthony@therussofirm.com

James C. Kelly, Esq. (*pro hac vice*)
THE RUSSO FIRM
244 5th Avenue, Suite K-278
New York, NY 10001
T: 212-920-5042
E: jkelly@therussofirm.com

*Counsel for plaintiff*